Morning. My name is Barry Paisner. With me is Council Susan Eastman and the appellant Justin Begay and also his wife is back there. I'd like to reserve three minutes for rebuttal. This case is about legal residency and the temporary away agency policy. Intent to continue as established legal residence is Mr. Begay's position. Justin Begay is from the Hopi Partition land, Tisto area, Finger Point, Arizona. It's 50 miles north of Winslow. Go up there, you may say this is the middle of nowhere. Mr. Begay would say it's the center of the universe. Many generations of his ancestors were born and died there. He was born in Keams Canyon Hospital, that's on the Hopi Reservation and brought home to Finger Point. The family were subsistence ranchers. They lived off sheep and cattle they grazed. In 1950s, in the 1950s, Mr. Begay's mother and father built their home near Mrs. Begay's mother's home, S.E. Atikai. They also built a little shack next to the home. That was their home. On December 22, 1974, the Settlement Act was passed into law. The life in Tisto changed and people heard that they were going to be subject to forced relocation. In 1974, a building freeze was instituted. No building of new structures was allowed. No repair. Can I ask you to address the specific issue that's at the heart of this case, which is whether his residence for purposes of the Settlement Act was in Snowflake versus Finger Point? I'm sorry, Your Honor. In Snowflake versus Finger Point? Yes, Your Honor. You know, that issue is mere residency versus legal residency or domicile. So the agency, and the reason I gave that background, Your Honor, is the agency understood in the passage of the act and in issuing their regulations that the Hopi Partition Land or HPL was inhospitable. And not only was it inhospitable, it was, there was no employment. There was no schooling. So the HPL for education and or employment. And that's exactly what the Begay family did. Can I, I'd like to just address an issue with you that you spoke of. And you spoke of domicile. I have a pretty long list of cases here from the Ninth O'Neill from 2021 in which this court, the Ninth Circuit, has repeatedly said that domicile doesn't apply to the legal residence question under the act. So I respect your argument. I understand the points you're trying to make. But it seems to me that as a reviewing court, we have to look at whether or not these recurrent and frequent contacts were properly analyzed by the hearing officer and give him or her deference. And, you know, for good or for bad, there was plenty of evidence, it seemed to me, that the hearing officer could rely on to determine that Mr. Begay had left the reservation before the time he became self-supporting. Thank you, Your Honor. The Daw and also the Shaw case, they were both, I was the attorney on both those cases, Your Honor. But specifically, those cases rejected my, or our argument that the burden shifted to the relocation commission once the court showed original domicile in 1974. Those cases do not reject domicile. What they do is they reject the part of domicile law that says once an applicant demonstrates domicile, it's the burden of the party taking the position that domicile changed, it's their burden. The court said, no, there's nothing in the law that says that. Now, the agency, and I attach, I think, in my brief, to the addendum to the brief and the addendum to the reply, about eight cases by this same hearing officer where he important a tenet of domicile law, which is you can only have one domicile and you have to show an abandonment of the original domicile to create the new domicile. That is something the agency's hearing officer has used in numerous cases and the district court here in Arizona has also used that in the Gamble case, which is attached. Okay, and let me follow up briefly if I might. If, and I'll have to look at this, but if the standard should be the application of traditional, I suppose, state property domicile law, then how would that differ in terms of result here that Begay wasn't domiciled in finger point, at least as to 86, the hearing officer considered the his domicile or whether or not you're looking at the nature of the visits and the contacts and where he actually lived under O'Neill's analysis here that we could affirm on either ground, would you agree with that? That we could. Okay. I believe if you examine the facts that, first of all, his parents lived in an apartment that they rented. He had no leasehold interest in it. He stayed there until he graduated high school. This was in Snowflake? Snowflake. Thank you, Your Honor. In Snowflake. His parents moved there. It didn't change their domicile. Their domicile remained finger point, T-stone. He, once he became an adult, didn't stay there. He went on to live in an apartment in Phoenix with his sister, brother-in-law, and two children, a one-bedroom studio apartment. That is not his home. You know, it's like the old song, everywhere I hang my hat is my home. Well, that may be true, but it's not your domicile. It's not your legal residence. You have to have an intent to make that place. So, your position is that finger point was always his domicile? Yes, sir. Irrespective of where he lived, where he listed his address, etc.? Irrespective of where he lived, because his intent was always to have finger point as his home. What the hearing officer ignored, which I believe is error, is the fact, key facts, but the main fact is that he actually had a home there. He had a home there. Okay, his parents did, right? I don't think the agency makes a distinction within the family that everyone claims the family home with regard. Here's kind of the problem I have, because you write about, but look, the facts are, as Judge Hawkins said, Begay had a mailing address in Snowflake. He went to school in Snowflake. He worked in Snowflake and Tempe. He didn't register to vote with his tribe, and there was some testimony about him actually referring to Snowflake as his home, and all that may or may not point to what intent was, but if the only evidence of intent is that he said, I intended to stay in Finger Point, that can't be a legal standard that any hearing officer would justifiably be required to follow. Do you see what I'm saying? No one would give it up that easily. No American would, and I think the hearing officer also erred in solely relying on recurring and substantial contacts to deny this application. He did not do an analysis of intent. He simply did a substantial and recurring contacts test, which that could be a factor, but it can't be the sole basis. In the Charles case, this court overturned the district court for stating that legal residence was an analysis of recurring and substantial contacts. They said no. This court said no. That's wrong. That's wrong, and it is wrong because recurring and substantial contacts was the test up until 1984 when they changed their regulations to legal residence, domicile, intent. There's no way to get around that it's a domicile test, intent to continue a, intent to keep something as your home. That is the test. That's the test in the CFR, and that's the test that's been applied erratically throughout this. I think you said you wanted to save three minutes for rebuttal, and then you're cutting into that. I'm at it. Thank you. We'll hear now from Mr. Franklin. Good morning, Your Honors, and may it please the court. David Franklin on behalf of the Office of Navajo and Hopi Indian Relocation. Substantial evidence supports the hearing officer's determination here that plaintiff was not eligible for relocation benefits because his legal resident, when he became the head of his own household in 1986, was not on Hopi partition lands. The hearing officer rationally determined that the array of indicators tying plaintiff to Snowflake and then later to Phoenix outweighed the evidence that plaintiff offered to support his claim of continued residence on the HPL, which was primarily visits to his childhood home that were brief, that were social in nature, and that were of questionable frequency. Your opposing counsel argues, I think, that there's a difference between domicile and residence. For the purpose of the act, do you agree? Well, there is a difference between domicile and residence. The inquiry is one set out by O'Neill's regulations, which define residence as a legal resident standard where you examine an applicant's intent and manifestations of that intent as of the relevant date. Which is 1986. That's correct. Which is distinct from the domicile inquiry, which is one that adopts a burden-shifting framework where, in this case, plaintiff suggests that because as a dependent minor before the age of 10, he lived on the HPL, therefore, since he established that as a childhood domicile, the burden would then shift to O'Neill to establish that that changed at some point. His contention is that essentially we've said that if you strip out the burden-shifting aspect, the domicile standard is essentially the same as the legal residence standard. Is that right? And if it's not, what's the difference between the two? Yeah, I'm not sure how you strip out the burden-shifting aspect because that seems to be what plaintiff is asking this court to do. Plaintiff is saying, look at his residence when he was 10 years old and before, and because we've established that, then O'Neill needs to prove a different residence. Everyone agrees that the burden-shifting doesn't apply. So if we set that aside, is there any material difference? Is this all much ado about nothing? It doesn't sound like anyone's saying that what's left of domicile is really different from legal resident once you set aside the burden-shifting part. Yeah, that's a fair point. I think once you take out the burden-shifting framework, there is certainly a lot of overlap between the domicile and residence inquiries. I'm not sure how distinct they would be in this circumstance. I would say that O'Neill has regulations that control here, but I couldn't point to any way that they would be distinct. Look, if you take out this burden-shifting analysis, which I think is how plaintiff gets to where plaintiff wants to get to. Under either the O'Neill regulations or traditional domicile law then, the issue of intent has to be examined in both inquiries, correct? That's correct. And Mr. Begay says, it was very clear that I intended to stay in Finger Lake. That was his clearly expressed intent, which he relies on this morning. But I guess my question to you as a legal matter is, how is that type of expression of intent analyzed in regard to other evidence, and in specific, the evidence that the hearing officer relied on here? It's one factor that goes into the analysis, and here the hearing officer weighed all of the factors, both for and against residence on the HPL. And I'll go through some of this, but plaintiff moved to Snowflake, Arizona when he was 10. He went to primary school there and high school there. After graduating at the age of 19, when he had no work obligations and no school obligations tying him to Snowflake, he elected to stay in Snowflake rather than spend any extended period at Finger Point. And in his testimony about that time period, he stated that he, quote, stayed home in Snowflake rather than go back to Finger Point. So in his own words, he understood Snowflake and not Finger Point to be home. Later, he found employment. He lived away from his parents. He found a full-time job. He paid rent all off of the HPL. And then when plaintiff returned from Phoenix in 1988, he ended up going back to Snowflake, not to the HPL, and he continued to live and work in Snowflake for many years. And so there is this wealth of objective indicators. There is this wealth of evidence. Could he have lived in Finger Point at that point? Say again? Could he have lived in Finger Point at the point in time you just described, if he wanted to? I mean, there was no bar to him living in Finger Point. But, I mean, Your Honor's question may be directed to the idea of whether there were sort of employment opportunities available in Finger Point. And the answer is it may not have been. But the question is you look to all of these indicators of intent, that you look to these objective manifestations of intent. And on the one side, you have these visits. The two that his counsel points to are that he maintained a home there and that he regularly went there in the summers. What about those factors? So plaintiff says he regularly went there in the summers, but that actually stopped in the approximately two years before the eligibility determination. So when he was a child, he did spend summers there. But the question here is when he was a self-supporting adult, did he continue to spend time? And the fact is there is no evidence that he spent any period longer than a couple days there in the couple years when he was an adult and then became self-supporting. So he didn't maintain those ties. Ultimately, this case turns on a question of substantial evidence. The hearing officer in the first instance, the agency in the first instance, is the one that is entitled to weigh these different factors for and against where the residence is. And here, we're not saying there's no evidence on the other side. But the hearing officer was well within his discretion to determine that the evidence tying plaintiff to locations off of Finger Point weighed more heavily than the evidence tying plaintiff to continued residence at Finger Point. What about the continued maintenance of a physical home there? Well, there isn't any evidence that the plaintiff did much to maintain the continued, his home. I mean, the testimony was that he went back, in his own words, he said he sometimes went back. And when he would go back, he would be there to spend time with family, to bond with family, and to help his grandmother. And I think there is an aspect of helping his grandmother manage her household while he was there. But helping his grandmother manage her distinct separate household doesn't show that plaintiff intended for his own separate household to be located on Finger Point. I think there needs to be more than that. And in addition to the fact that these visits to Finger Point were brief in duration, were really social in nature, the hearing officer rationally determined, he made a credibility finding, that it was unlikely that that plaintiff, in fact, spent two to three times per month going back to Finger Point. And he reasonably explained that inconsistencies in the testimony between the different witnesses, about the logistics and about the time frames of those visits, undermine plaintiff's account. And that is an additional reason. I mean, I think the hearing officer here framed his analysis as a bit in the alternative. He's saying, first, I think the amount of time that plaintiff spent at Finger Point is being exaggerated by these witnesses. But even in any event, that the nature of what these visits were wouldn't overcome that evidence tying plaintiff to Snowflake as opposed to Finger Point. And again, I'd come back to plaintiff's own words here. When plaintiff testified and when he was asked during this period after he graduated high school, where did you go? He said he stayed home. And when asked for clarification by home, he said he meant Snowflake. So it's his own words here that describe Snowflake rather than Finger Point as his home. I would quickly just go into the other claim of legal error that plaintiff raises here, which is the idea that the hearing officer somehow erroneously focused on substantial and recurring contacts because the decision plainly shows that the hearing officer engaged in a really holistic examination of residents, looking at all the factors that weighed for residents and where plaintiff's contacts were just one of those factors. And there is some irony here with plaintiff taking issue with the hearing officer's language in reciting the phrase substantial and recurring contacts because that language was drawn directly from plaintiff's own post-trial briefing to the hearing officer, where his central argument, and I'll quote from his brief here, was that he maintained substantial and recurring contacts with his home on the HPO. So in considering this as one factor of many and using the same language plaintiff himself used to make the argument, that can't be reversible error. As a whole, I think our broad point here is that the hearing officer did weigh all the evidence. He adequately explained how he weighed that evidence, and he made a decision that's supported in this case by the deferential substantial evidence standard. I'm happy to answer any further questions this court may have on any other issue. All right. Thank you, counsel. Thank you. And we'll hear rebuttal now from Mr. Pace. Sounds like your argument, counsel, is that home is the place where when you go there, they have to let you in. Right. Is that the legal standard? I believe it is, Your Honor. You know, if you read, you know, this court has ruled on domicile since the 40s or the 20s, I think. The Weebly case. It's the difference between mere residence and domicile. It is the intent of the individual that has to be examined. And this hearing officer did not do that. He holds the applicant did not maintain substantial and recurring contacts with his grandmother's residence in Finger Point to be considered having retained that area as his legal residence. That's really his holding. It's solely based on substantial and recurring contacts. When your client was asked at the hearing, as I understand it, you correct me if I'm wrong, where is home? He said Snowflake, right? I don't think it was quite that direct, but he referred to Snowflake as home. I will ask you to look at the record, though, Your Honor, because I did. Home is mentioned in the transcript at least 17 times, and it's interchangeable between Tisto and Snowflake. And I think that's really what's going on. Snowflake was his residence, his mere residence, not his domicile. Phoenix was his mere residence. He was just there for employment. We're looking at a two-year period from the time he graduated high school to July 7, 1986, when the agency represented to the world that it was going to be finished with everything to do with relocation. Well, here we are in 2023. It's not over. It's that two-year window. As a minor, he takes on his parents' legal residency. That's undisputed. So it's this two-year period. He did not change his intent. He wanted to go back to Tisto. He did go back to Tisto in a group move with his parents. He asked whether he could move back to Tisto. Well, no, you can't move back once your family is relocated. They quitclaim, he and his mom and his sister quitclaim the property to the United States government. Counsel, your time has expired. I think we understand the arguments. I appreciate the arguments of both sides. In the case of Begay v. Office of Navajo and Hopi and Indian, relocation is submitted for decision. Thank you.
judges: HAWKINS, COLLINS, Murphy